UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

          Plaintiff,

v.

Yvette NMN Kouayara,

          Defendant.

Court File No. 15-cr-165 (JRT/LIB) (28)

**REPORT AND RECOMMENDATION**

This matter comes before the undersigned United States Magistrate Judge upon Defendant Yvette NMN Kouayara's ("Defendant") Motion for Severance of Counts and Defendants, [Docket No. 490]; Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 497]; Motion to Suppress Statements, Admissions, and Answers, [Docket No. 499]; and Motion to Dismiss Indictment for Improper Venue, [Docket No. 502]. This case has been referred to the undersigned Magistrate Judge for a report and recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a motions hearing on October 19, 2015, regarding the parties' pretrial motions.[1] At the motion hearing, the Court granted the parties' requests for the opportunity to provide supplemental briefing.  The Court took Defendant's Motion for Severance of Counts and Defendants, [Docket No. 490]; Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 497]; Motion to Suppress Statements, Admissions, and Answers, [Docket No. 499]; and Motion to Dismiss Indictment for Improper Venue, [Docket No. 502], under advisement on November 15, 2015.

For reasons discussed herein, the Court recommends that Defendant's Motion for Severance of Counts and Defendants, [Docket No. 490], be **DENIED**; that Defendant's Motion

---

[1]The Court addressed the parties' pretrial discovery motions by separate order, [Docket No. 985].

to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 497], be **DENIED**; that Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 499], be **DENIED**; and that Defendant's Motion to Dismiss Indictment for Improper Venue, [Docket No. 502], be **DENIED**.

## I.   BACKGROUND AND STATEMENT OF FACTS

### A. Background

On May 20, 2015, Defendant was indicted with one charge of conspiracy to distribute heroin, methamphetamine, oxycodone, hydromorphone, hydrocodone, and methadone, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. (Indictment [Docket No. 1]).

### B. Facts[2]

On November 5, 2014, North Dakota Bureau of Criminal Investigation Special Agent Travis Zahn ("SA Zahn"), who is assigned to the Lake Region Narcotics Task Force, received a call from Chief Ray Cavanaugh of the Spirit Lake Tribal Police Department. Chief Cavanaugh told SA Zahn that he had received information that a group of eight African American males may have been dealing narcotics out of the Spirit Lake Casino. Based on that information, SA Zahn traveled to the Spirit Lake Casino to see if he could spot the group.

While SA Zahn was on the fourth floor of the casino, he encountered a group of four African American males who passed him in the hall and who were staying in three adjoining rooms on that floor. SA Zahn suspected that the four individuals were members of the group referred to by Chief Cavanaugh. SA Zahn then visited the casino's security offices. The Lake Region Drug Task Force maintains an ongoing relationship with the Spirit Lake Casino security staff, who will forward reports to the task force of individuals suspected of dealing narcotics on

---

[2] Except where expressly indicated otherwise, the Court's statement of facts is derived from the testimony of North Dakota Bureau of Criminal Investigation Special Agent Travis Zahn at the October 19, 2015, motions hearing.

the casino premises. SA Zahn asked the casino surveillance staff whether there was anybody in the casino that security thought may be dealing in narcotics. The casino surveillance staff indicated that SA Zahn should be aware of the group of four African American males that he had just encountered on the fourth floor of the casino.

Casino security staff then showed SA Zahn video surveillance footage of an African American male getting into the back seat of a white SUV by a grocery store that is located near the entrance to the casino premises and then exiting the vehicle a minute or two later. SA Zahn was able to see that the African American male had received money from an individual who was already in the SUV. To SA Zahn, the footage appeared to depict a drug transaction. However, the angle and quality of the surveillance footage was such that SA Zahn could not clearly see or identify the items that he believed to have been exchanged for the money the African American male had received.

SA Zahn took no further direct investigative action that day but asked casino security to keep watch on the group that they had identified and to notify him if the security staff observed any suspicious activity.

On November 6, 2014, casino security called SA Zahn to inform him that they had obtained surveillance footage of suspicious activity. Casino security informed SA Zahn that the group that had been staying in the three adjoining rooms on the fourth floor of the casino the night before had moved to Spirit Lake Casino Cabin #5 ("Cabin Five"), a cabin located in a campground on the casino premises with the street address 7889 Highway 57, Saint Michael, North Dakota, 58370.[3] (See Govt.'s Ex. 1 (listing the address of Cabin Five)). SA Zahn again traveled to the casino to view the footage. The footage depicted an African American male,

---

[3] SA Zahn received information from casino security that Defendant Calvin Beasley and Defendant Michael Dominguez rented the adjoining rooms on the fourth floor of the casino and that Defendant Michael Dominguez had rented Cabin Five.

whom SA Zahn later identified as Defendant Calvin Beasley ("Defendant Beasley"), walk from Cabin Five to get in the back seat of the same white SUV that SA Zahn had seen in the surveillance footage the day before. SA Zahn was able to identify two individuals who were in the SUV when Defendant Beasley entered it.  One of the individuals, William Cavanaugh, was known to SA Zahn to use and deal drugs and to have a criminal record of convictions for offenses unrelated to narcotics. On the video footage, SA Zahn was able to clearly see William Cavanaugh, who was sitting in the front passenger seat of the SUV, count out money which he then handed back to Defendant Beasley and Defendant Beasley then provide William Cavanaugh with a small plastic bag containing a substance SA Zahn could not identify. After the transaction was finished, Defendant Beasley exited the SUV and returned to Cabin Five.

After reviewing the surveillance footage, SA Zahn drafted an application for a warrant to search Cabin Five, which he submitted to the Honorable Donovan Foughty, District Judge of the Northeast Judicial District of the State of North Dakota. SA Zahn offered a sworn oral probable cause statement to Judge Foughty in support of the search warrant application. (See Govt. Ex. 2).

In the oral probable cause statement, SA Zahn said that on November 5, 2014, he had been contacted by Chief Ray Cavanaugh, who told SA Zahn that there was a group of eight African American males staying at the Spirit Lake Casino and that Chief Cavanaugh had received information from an anonymous source that the group was in possession of approximately $10,000 worth of drugs and currency. (Id.). SA Zahn stated that he had visited the casino on November 5, 2014, and located the group as staying in three adjoining rooms on the fourth floor of the casino. (Id.). SA Zahn stated that he had then visited the casino security offices, where he had been shown video surveillance footage of what appeared to SA Zahn, in his training and experience, to depict a drug transaction.  On the surveillance footage, an African

American male came out of one of the rooms on the casino's fourth floor, walked to the parking lot, and then entered the vehicle of William "Huck" Cavanaugh, whom SA Zahn knew to use and deal drugs and to have been convicted of a number of crimes unrelated to narcotics. (Id.). SA Zahn stated that the footage showed the African American male and William Cavanaugh exchanging money. (Id.).

SA Zahn also stated that, on November 6, 2015, he had again been contacted by casino security, who had informed him that they had witnessed a second transaction involving William Cavanaugh. (Id.). SA Zahn stated that he had travelled to the casino to view the surveillance footage of the transaction. (Id.). SA Zahn stated that the video footage showed a female driving a 1997 GMC Yukon in which William Cavanaugh was a passenger. SA Zahn stated that the surveillance footage showed the same African American male that SA Zahn had seen depicted in the November 5, 2014, video footage, exit Cabin Five and walk to the Yukon, where he entered the back passenger seat.  (Id.). SA Zahn stated that the casino security officers had zoomed in on the transaction and, as a result, SA Zahn could see on the surveillance video that William Cavanaugh had counted and handed money back to the African American male, who then handed William Cavanaugh a plastic baggie containing an unidentified substance. (Id.). SA Zahn stated that the African American male returned to Cabin Five after the exchange. (Id.). SA Zahn stated that, in his training and experience, the November 6, 2014, video appeared to depict a drug transaction. (Id.).

SA Zahn stated that he believed that the group staying in the three adjoining rooms on the fourth floor of the casino on November 5, 2014, had moved to and was staying in Cabin Five at the time that he provided his sworn oral statement to Judge Foughty. (Id.).

After SA Zahn provided his sworn oral statement, Judge Foughty concluded that probable cause existed to search Cabin Five. (Id.). Judge Foughty then issued a warrant to search Cabin Five for controlled substances, drug paraphernalia, cell phones, records that would indicate illegal drug sales or usage, illegal prescription medication, marijuana, methamphetamine, heroin, monies obtained from drug sales, firearms, ammunition, and other dangerous weapons. (See Govt. Ex. 1).

SA Zahn and thirteen other officers executed the warrant on November 6, 2014, as well. Upon entering Cabin Five, the officers first checked the cabin for occupants.  Inside the cabin, the officers found five individuals, Defendant, Defendant Yalonzo Hull, Steve Fagan, Defendant Brenda Fagan, and Miranda Horse. The officers secured the individuals, frisked them, handcuffed them, and sat them either on the cabin's couch or at the cabin's kitchen table, both of which were in a large open area in the center of the cabin.

While the officers then performed the search of Cabin Five, Lieutenant Lenore of the Bureau of Indian Affairs noticed Steve Fagan staring at a vent in the Cabin's central open area. The officers became suspicious and looked inside the vent, where they discovered approximately 460 pills, packaged in bundles of ten to twenty pills in tied-off corners of plastic baggies, which contained a variety of controlled substances, including oxycodone and hydromorphone. In SA Zahn's experience, packaging pills in those quantities and manner was consistent with packaging for distribution. The officers discovered an additional forty to fifty pills in the cabin's other rooms.

The officers then questioned the secured individuals. SA Zahn read a single recitation of the Miranda warnings to all of the secured individuals as a group. SA Zahn did not get individual verbal waivers of the Miranda rights from each of the individuals. The officers executing the

search warrant then began asking the individuals questions. Although the officers directed some general questions to the five individuals as a group, most of the questions were directed by individual officers to single individuals. SA Zahn questioned Defendant, who answered his questions. Defendant told SA Zahn that the people in Cabin Five were at the casino for a vacation.

At some time during the execution of the search warrant, Detective Sue Schwab of the Devil's Lake Police Department observed Defendant's purse sitting on the table in the cabin's kitchen. Detective Schwab inspected the interior of the purse, where she discovered a false identification document. SA Zahn asked Defendant about the false identification document, but he does not recall how Defendant responded.

The officers arrested all five individuals, including Defendant, on November 6, 2014, on the basis of the evidence gathered during the execution of the search warrant.  The officers then transported Defendant, Defendant Hull, Defendant Fagan, and Steve Fagan to the Lake Region Law Enforcement Center in Devil's Lake, North Dakota, which is located approximately six miles north of the Spirit Lake Casino. The officers transported Miranda Horse, who is a tribal member, to the Fort Totten jail on the reservation.

On November 10, 2014, SA Zahn and another officer interviewed Defendant at the Lake Region Law Enforcement Center, where Defendant was still being held in custody. The officers interviewed Defendant in a room in the Center that serves as both an interview room and a conference room. There is only a single entrance to the room. The room contains a large conference table with at least six chairs around it. The room also contains two filing cabinets, storage boxes, and a television. SA Zahn made a video recording of the interview.

A jailer brought Defendant into the interview/conference room and left her to wait there. (See Govt. Ex. 3). SA Zahn arrived in the interview/conference several minutes later, upon which SA Zahn asked Defendant how she was doing. (See Id. at 1:20). SA Zahn then called another officer to attend the interview.  (Id. at 2:20). SA Zahn shut the door to the interview room, introduced himself to Defendant, and told Defendant that he was there to talk to her about the events of November 6, 2014. (Id. at 2:45).

SA Zahn read Defendant the Miranda warnings. (Id. at 3:10-3:35).  He then asked Defendant whether she understood the Miranda rights. (Id. at 3:35).  Defendant said "yes." (Id. at 3:37). The following conversation then occurred:

SA Zahn:       Did you want to talk to me about what went on the other night?

Defendant:     Um. I would like a lawyer to be present.

SA Zahn:       Okay. Then I'm not going to talk to you about anything that went on the other night or ask you any questions. Do you have a lawyer right now?

Defendant:     Well… you know what… Is the…I don't know. I don't know what to do. Because I need to know where I stand and…

SA Zahn:       Okay… Uh…

Defendant:     But I'll talk to you. I mean I'll tell you …

SA Zahn:       Well, if you want a lawyer I'm not going to ask you any questions though. I can't.

Defendant:     Go ahead and ask me some questions.

SA Zahn:       Well, do you want a lawyer present or not?

Defendant:     I don't have a lawyer right now.  So…

Sa Zahn:       Yeah.  But if you want one present, I'm not going to ask you anything. You know what I mean?  Because I don't want… I don't want to get myself in a jam.

Defendant:       Yeah.

[Other Officer enters].

Officer:         Good morning.

(Govt. Ex. 3 at 3:40-4:30)

     At that point SA Zahn asked Defendant to pronounce and spell her name, to provide her social security number, and to provide her address. (<u>Id.</u> at 4:30- 6:30). SA Zahn then stated that Defendant had said that she wanted a lawyer present, and that he was not going to ask Defendant any questions. (<u>Id.</u> at 6:30-6:35). The following exchange then occurred:

SA Zahn:        We did take some money from you, right?  Is that right? How much did we take from you?

Defendant:       About three hundred and some dollars. (<u>Id.</u> at 6:39-6:41).

SA Zahn:        Okay.  I've got a form I've got to fill out and give it to you and then … I'll take you back. But like I said, if you want to talk to us that's fine.  But since you said you don't…

Defendant:      I do want to talk to you.  I do want to tell you about some things. Um.

SA Zahn:        Well then do you …do you want your lawyer here or not? Because I can't.  You'll have to wait until you get your court appointed one and then come talk to me. That's up to you.  If you want to tell me without your lawyer present, you can do that.  But… it's up… it's up to you what you want to do.  I'm not going to …

Defendant:      I've never been through this before. I'll talk to you without my lawyer here present.

SA Zahn:        Okay. I'm going to grab that form right away and I'll be right back.

(<u>Id.</u> at 6:36-7:25).

SA Zahn and the other officer then left the room. The officer returned shortly thereafter with a "Warning and Consent form." (Id. at 7:30-8:30; Govt. Ex. 10). The officer read Defendant the Miranda warnings a second time. (Govt. Ex. 3 at 8:30-9:15). The other officer then reviewed the form with Defendant. (Id. at 9:16-10:00). Defendant signed the form.  (Id. at 10:00; see also Govt. Ex. 10).

SA Zahn, who had returned to the room, began asking Defendant questions, to which Defendant responded. (See, gen., Govt. Ex. 3 at 10:15-55:24). The interview lasted approximately 55 minutes. (See, gen., Id.).

On May 20, 2015, Defendant was indicted with the charges against her. (Indictment, [Docket No. 1]).  In the Indictment, the Government alleges that between April 2014, and April 2015, "the defendants, conspiring with and aiding and abetting one another and other persons known and unknown to the grand jury participated in various roles and ways to procure, transport, and distribute controlled substances including heroin, methamphetamine, oxycodone, hydromorphone, hydrocodone, and methadone to the communities in and surrounding the Red Lake Indian Reservation, the White Earth Indian Reservation, and Native American communities elsewhere." (Id. at ¶ 1). The controlled substances were procured and transported from Detroit, Michigan; Chicago, Illinois; and Minneapolis, Minnesota, among other locations. (Id. at ¶ 2). The Indictment charges a total of forty-one (41) defendants as violating "Title 21, United States Code, Section 841(a)(1)." (Id. at ¶ 12, Count I).

 Regarding the present Defendant, the Indictment alleges that Defendant, along with other co-defendants, "did, among other things, facilitate, supervise, manage, transport, receive and transfer funds, and distribute controlled substances during the course of the conspiracy." (Id. at ¶ 4). The Indictment also alleges that Defendant's conduct as a member of the "narcotics

conspiracy charged in Count 1, which includes the reasonably foreseeable conduct of other members of the narcotics conspiracy charged in Count 1, involved quantities of mixtures and substances containing detectable amounts of heroin, methamphetamine, oxycodone, hydromorphone, hydrocodone, and methadone, in violation of Title 21, United States Code, Section 841(b)(1)(C)." (Indictment, [Docket No. 1], at ¶ 18).

## II.   DEFENDANT'S MOTION FOR SEVERANCE, [Docket No. 490]

Defendant moves the Court for an order, pursuant to Federal Rule of Criminal Procedure 14, severing her case from those of all of the other defendants in the present case. (Def.'s Motion for Severance, [Docket No. 490]).

### A.  Standard of Review

An indictment may charge two or more defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "For proper joinder under this provision, it is not necessary that every defendant have participated in or be charged with each offense." United States v. Warfield, 97 F.3d 1014, 1019 (8th Cir. 1996) (internal quotation and citation omitted). "[R]arely, if ever, will it be improper for co-conspirators to be tried together." Id. (citing United States v. Jackson, 64 F.3d 1213, 1217 (8th Cir. 1995)).

The Federal Rules of Criminal Procedure also provide that if joinder creates prejudice to either the Government or a defendant, the Court may sever a trial "or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). However, "[i]f, under Rule 8, joinder is proper, then the defendant seeking severance has a 'heavy burden' in demonstrating that a joint trial will impermissibly infringe his right to a fair trial." United States v. Hopkins, No. 11–230 (DWF/SER), 2011 U.S. Dist. LEXIS 127071, at *25–26 (D. Minn. Oct. 5, 2011) (citing

Warfield, 97 F.3d at 1019). "There is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537 (1993); see also United States v. Clay, 579 F.3d 919, 927 (8th Cir. 2009). "Joint trials play a vital role in the criminal justice system," because they achieve certain efficiencies, and because they "avoid[ ] the scandal and inequity of inconsistent verdicts." Richardson v. Marsh, 481 U.S. 200, 209–10 (1987). "Only in an unusual case will the prejudice resulting from a joint trial be substantial enough to outweigh the general efficiency of joinder." Clay, 579 F.3d at 927 (citing United States v. Al–Esawi, 560 F.3d 888, 891 (8th Cir. 2009)). "The risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions." United States v. Mickelson, 378 F.3d 810, 818 (8th Cir. 2004).

B. **Analysis**

Defendant offers mere boilerplate arguments in support of her motion, asserting in a conclusory fashion that the Defendants and the counts of the indictment are not properly joined; that the jury will find it difficult to distinguish each defendant's alleged acts and the evidence presented as to each count; that evidence may be introduced that would be inadmissible as to certain defendants; that Defendant's right against self-incrimination will be jeopardized; and that separate trials would be more fair to the defendant. (See Def.'s Motion for Severance, [Docket No. 490]). Defendant articulates no specific facts demonstrating either (1) that joinder of the defendants was improper under Rule 8(b), or (2) that continued joinder will create prejudice sufficient to warrant severance pursuant to Rule 14.

Defendant's boilerplate arguments as submitted on the present record do not suffice to carry her heavy burden to demonstrate that severance is warranted. The Court could summarily recommend denying Defendant's motion on this basis alone.  However, in an abundance of

caution, the Court also notes that the factual allegations in the Indictment indicate that joinder was indeed proper under Rule 8(b) and that severance pursuant to Rule 14 is not warranted on the present record.

The factual allegations in the Indictment indicate that the Defendants participated in the same series of acts or transactions constituting the charged offenses. See Fed. R. Civ. P. 8(b). Specifically, the factual allegations set forth in the Indictment indicate that Defendant, along with other co-defendants and alleged co-conspirators, "did, among other things, facilitate, supervise, manage, transport, maintain residences, receive and transfer funds, and distribute controlled substances during the course of the conspiracy." (Indictment, [Docket No. 1], at ¶ 4). The factual allegations set forth in the Indictment also indicate that the defendants acting together conspired with others to possess, with intent to distribute, controlled substances including heroin, methamphetamine, oxycodone, hydromorphone, hydrocodone, and methadone. (Indictment, [Docket No. 1]). Accordingly, under Rule 8(b), joinder of the Defendants was proper as "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Warfield, 97 F.3d at 1019 (citing Fed. R. Crim. P. 8). See also, Id. (noting that it is not necessary for the purpose of joinder that every defendant have been alleged to have participated in or be charged with every offense).

Because joinder of the Defendants was proper under Rule 8(b), Defendant necessarily bears the heavy burden of demonstrating that a joint trial will impermissibly infringe on her right to a fair trial. Nothing in the record presently before the Court, however, indicates that Defendant stands to incur any specific prejudice that is attributable to the joinder of the Defendants that would be sufficient to warrant severing Defendant's case. Defendant's boilerplate arguments do not identify any specific prejudice that she would incur as a result of the joinder of the

Defendants and, as a result, are similarly insufficient carry her burden to show that severance is warranted here. The Court also notes that Defendant does not even argue that any specific evidence will be admitted against her co-defendants that will prejudice her and does not offer any argument that such prejudice can only be cured by severance pursuant to <u>Bruton v. United States</u>, 391 U.S. 123 (1968).

In <u>Bruton</u>, the petitioner and a co-defendant had been convicted of armed robbery in a joint trial after a postal inspector testified that Bruton's codefendant had confessed and had "expressly implicat[ed]" the petitioner. <u>Bruton</u>, 391 U.S. at 124 n. 1. The trial court instructed the jury that the co-defendant's confession "if used, can only be used against the [co-defendant]. It is hearsay insofar as the [petitioner] is concerned, and you are not to consider it in any respect to the [petitioner], because insofar as he is concerned it is hearsay." <u>Id.</u> at 125 n. 2. The Supreme Court, however, concluded that:

> [T]he introduction of [the co-defendant's] confession posed a substantial threat to the petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard [the co-defendant's] inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.

<u>Id.</u> at 137. For that reason, the Supreme Court reversed the petitioner's conviction in <u>Bruton</u>. <u>Id.</u> at 126, 137.

However, even the <u>Bruton</u> court suggested that redacting a co-conspirator's testimony may be sufficient to cure any prejudice caused by the introduction of a co-defendant's incrimination statement, and acknowledged that "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions." <u>Id.</u> at 134 n. 10, 135. In <u>Richardson v. Marsh</u>, 481 U.S. 200 (1987), the Supreme

Court further distinguished between co-defendant statements that are "facially incriminating," and statements which merely are "incriminating by connection." Id. at 209. When a co-defendant's statement is facially incriminating of the defendant, redaction or even severance may be required because it is more difficult for jurors to set aside such evidence. Id. at 208. However, the Court rejected as both impractical and unnecessary the suggestion that the rule in Bruton extend to confessions that are incriminating by connection. Id. at 208–09.

As noted above, Defendant has not supported her motion by identifying any specific incriminating evidence, much less any specific co-defendant statements, that she believes would prejudice her if introduced at trial.  Moreover, Defendant has not articulated any specific reason why the jury would be unable to compartmentalize any redacted statements or evidence upon being provided a proper instruction by the trial judge to do so. (See, gen., Def.'s Motion for Severance, [Docket No. 490]).

As articulated above, there is a strong preference in the federal system for joint trials. In light of that preference, and at this early juncture, where Defendant can only invite the court to speculate as to what evidence the Government might actually seek to introduce at a joint trial, severance is not appropriate. "Severance is a remedy that can be provided at the time of trial if appropriate under the circumstances." United State v. Billups, No. 06-cr-129 (PJS/AJB), F. Supp. 2d 697, 706 (D. Minn. 2006).

For all the reasons articulated above, the Court recommends **DENYING** Defendant's Motion for Severance, [Docket No. 490], without prejudice.

### III.    DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF SEARCH AND SEIZURE, [DOCKET NO. 497]

Defendant moves the Court for an order suppressing any evidence obtained as a result of the execution of the search warrant on November 6, 2014; as a result of Defendant being seized

while the search warrant was being executed; as a result of the search of Defendant's person; and as a result of the search of Defendant's purse.

**A. Search Warrant**

Defendant first challenges the sufficiency of the probable cause supporting the warrant to search Cabin Five on November 6, 2014.

1. Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d

692, 694 (8th Cir. 2009) (quoting <u>United States v. Reivich</u>, 793 F.2d 957, 959 (8th Cir. 1986)).

"Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" <u>United States v. Wiley</u>, No. 09-cr-239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting <u>United States v. Solomon</u>, 432 F.3d 824, 827 (8th Cir. 2005); edits in <u>Wiley</u>). In addition, the issuing court's "'determination of probable cause should be paid great deference by reviewing courts,'" <u>Gates</u>, 462 U.S. at 236 (quoting <u>Spinelli v. United States</u>, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the issuing court] had a 'substantial basis for . . . [concluding]' that probable cause existed." <u>Id.</u> at 238-39 (quoting <u>Jones v. United States</u>, 362 U.S. 257, 271 (1960)).

2. <u>Analysis</u>

SA Zahn drafted the application for the search warrant and provided the sworn oral probable cause statement in support of the application. (Govt.'s Exs. 1, 2).

In his sworn oral probable cause statement, SA Zahn stated that the Chief of the local tribal police department had received information from an anonymous source about a group of African American individuals staying at the Spirit Lake Casino who were reported to possess approximately $10,000 in drugs and currency; that casino security identified a group of African American individuals in three adjoining rooms on the fourth floor of the casino as possibly dealing in narcotics; that casino security informed SA Zahn that the group that had been staying in those rooms had moved to Cabin Five on November 6, 2014; that SA Zahn saw video surveillance footage on November 5, and November 6, 2014, of the same African American male engaging in two transactions that, in the training and experience of SA Zahn, appeared to

be narcotics transactions; that the two transactions involved the African American man (later identified as Defendant Calvin Beasley) taking money from, and one transaction also involved the man providing a small baggie of some substance to, William Cavanaugh, whom SA Zahn knew to be a drug user and dealer; that the African American male that was involved in the transactions was part of the group who had been staying on the casino's fourth floor and, subsequently, Cabin Five; and that the African American male involved in those transactions came from Cabin Five to engage in the November 6, 2014, transaction, and returned to Cabin Five immediately afterwards. (Govt. Ex. 2).

"[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue[.]" United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000) (citing United States v. Koelling, 992 F.2d 817, 823 (8th Cir. 1993)). Numerous courts have concluded that the required nexus between contraband, in the form of narcotics for sale or the proceeds of such sales, and the place where the dealer is residing can be established when the dealer is observed to travel directly from the place where the dealer is residing to the location of a drug deal and then returning directly to that place of residence. See, e.g., Tellez, 217 F.3d at 550 ("We think that the discovery of drugs on Mr. Tellez shortly after leaving his home in response to an order placed by a customer certainly contributes to a finding of probable cause[.]"); United States v. Washington, 380 F.3d 236, 243 (6th Cir. 2004) (opining that a nexus existed between drug dealer's house when, among other factors, the dealer was observed to emerge from the house immediately prior to a drug deal and then travel directly to the site of the transaction); United States v. Green, 634 F.2d 222, 226 (5th Cir. 1981) ("The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a

place to which easy access may be had and in which privacy is nevertheless maintained. In normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime."). See also United States v. Summage, 481 F.3d 1075, 1078 (8th Cir. 2007) (noting that a judge deciding whether to issue a search warrant is allowed to make reasonable inferences as to where contraband may be found).

In the present case, Defendant Beasley's emergence from and direct return to Cabin Five before and after the November 6, 2014, transaction with a known drug user and dealer, which SA Zahn stated to Judge Foughty appeared in his training and experience to be a drug transaction, supported the finding of a nexus between Cabin Five and contraband, either in the form of the narcotics themselves or the proceeds of the sale to William Cavanaugh. That nexus was also consistent with the anonymous tip relayed by Chief Cavanaugh, which indicated that a group of eight African American males staying at the casino was in possession of significant amount of drugs and currency and may have been dealing narcotics out of the casino, which was corroborated by the video surveillance footage of Defendant Beasley, whom SA Zahn told Judge Foughty was a part of the group, engaging in the November 5 and November 6 transactions with a known drug dealer and user. See Florida v. J.L., 529 U.S. 266, 270 (2000) (noting that corroboration of details of an anonymous tip may make the tip more reliable).

Based on the information provided in SA Zahn's sworn oral probable cause statement, Judge Foughty had a substantial basis upon which to conclude that probable cause existed to issue the November 6, 2014, warrant to search Cabin Five.

However, even if the Court were to find that probable cause did not exist to believe that evidence of contraband could be found in Cabin Five, the Court concludes that Defendant's motion to suppress evidence gathered as a result of the execution of the search warrant would

nevertheless still be denied under the "good faith" exception set forth in United States v. Leon, 465 U.S. 897 (1984).

"Under the Leon good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." Grant, 490 F.3d at 632 (citing Leon, 468 U.S. at 922).  Even if the Court were now to conclude that the sworn oral statement supporting the November 6, 2014, search warrant application had not set forth facts within its "four corners" sufficient to demonstrate probable cause to search Cabin Five, on the present record, law enforcement's good-faith reliance on the warrant ultimately issued by Judge Foughty to search Cabin Five militates against suppressing any evidence obtained during the search. See Leon, 468 U.S. at 919-921 (exclusionary rule does not apply "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope"). See also United States v. Johnson, 219 F.3d 790, 791 (8th Cir. 2000) ("Even if we thought the warrant affidavit did not establish probable cause, the good faith exception to the warrant requirement would apply because the affidavit was sufficient to allow an officer to reasonably believe probable cause existed.").

The Court's review of SA Zahn's sworn oral statement in support of his application for the state court search warrant indicates that he presented Judge Foughty with specific facts indicating that there had been an anonymous tip that there was a group of African American males staying in the Spirit Lake Casino in possession of a significant amount of narcotics for sale; that a group of African American males was renting three adjoining rooms in the casino, that casino security identified the group as possibly dealing in narcotics; that SA Zahn observed video footage of one of the members of the group engage in two transactions in which he

received money from a known drug user and dealer; that the African American male provided a baggie of some unknown substance to the known drug user/dealer during the second transaction; that the group had moved from the three rooms in the casino to Cabin Five; and that the African American male receiving cash from the known drug user/dealer was seen to have come from Cabin Five before the transaction and return to it afterwards. Accordingly, when executing the search warrant for Cabin Five, SA Zahn and the other officers involved therein relied in good faith on the search warrant which had been issued by Judge Foughty based upon the application for a warrant setting forth those facts.

Because SA Zahn's sworn oral statement in support of his application for a warrant to search Cabin Five provided a substantial basis on which to believe that there was probable cause that evidence of a crime could be found in Cabin Five, and the executing officers in any event relied in good faith on the probable cause determination by Judge Foughty, the Court recommends **DENYING** Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 497], to the extent that Defendant challenges the probable cause supporting the warrant to search Cabin Five.

### B.  Seizure During Execution of the Search Warrant

Defendant next argues that the executing officers unlawfully seized her person during their execution of the search warrant for Cabin Five.  The evidence in the record presently before the Court indicates that the officers seized all of the occupants of Cabin Five upon entry, placing them in handcuffs and seating them in the cabin's common room while they executed the search warrant.

In <u>Michigan v. Summers</u>, 452 U.S. 692 (1981), the United States Supreme Court "defined an important category of cases in which detention is allowed without probable cause to arrest for

a crime.  It permitted officers executing a search warrant 'to detain the occupants of the premises while a proper search is conducted.'" Bailey v. United States, 133 S. Ct. 1031, 1037 (2013) (quoting Summers, 452 U.S., at 705). "Such detentions are appropriate, [the Supreme Court] explained, because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial." Muehler v. Mena, 544 U.S. 93, 98 (2005) (citing Summers, 452 U.S. at 705).

Accordingly, because the officers executing the warrant to search Cabin Five had the authority to detain those found inside Cabin Five while they were executing the search warrant, the Court recommends **DENYING** Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 497], to the extent that Defendant challenges the limited seizure of her person that occurred while the officers were executing the search warrant.

### C.  Search of Defendant's Person During Execution of the Search Warrant

Defendant next argues that the Court must suppress any evidence that arose from the officers' search of her person during the execution of the search warrant. On the record presently before the Court, it appears that the only search of Defendant's person occurred almost immediately after the officers entered the cabin, when the officers located the cabin's occupants, frisked them, handcuffed them, and gathered them in the cabin's central open room.

Defendant argues that the execution of a search warrant does not, without more, authorize the search of an individual not named in the warrant who is merely found on the premises to be searched. See Ybarra v. Illinois, 444 U.S. 85 (1979) (holding that a person's mere physical proximity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person). Officers are, however, allowed to take reasonable actions to ensure their own safety while they execute a warrant to search the premises named in

the warrant. <u>Los Angeles Cty., California v. Rettele</u>, 550 U.S. 609, 614 (2007). As noted above, "officers executing a search warrant for contraband have the authority 'to detain the occupants of the premises while a proper search is conducted'" <u>Muehler</u>, 544 U.S. at 98 (quoting <u>Summers</u>, 452 U.S. at 705 (1981)).  In addition, once officers have lawfully stopped a suspect, the officer may conduct a pat-down search of the suspect to ensure officer safety if the officer has reason to believe that the suspect may be armed and dangerous. <u>United States v. Cowan</u>, 674 F.3d 947, 951 (8th Cir. 2012) (citing <u>United States v. Horton</u>, 611 F.3d 936, 940-41 (8th Cir. 2010)).

In <u>Cowan</u>, the Eighth Circuit considered the seizure of a set of keys during a pat-down search of Cowan, who was one of several adults present in an apartment that was associated with a suspected drug dealer when the police executed a warrant to search the apartment and the suspected drug dealer. <u>Cowan</u>, 674 F. 3d at 951. The district court had excluded the keys, relying on <u>Ybarra</u> and reasoning that the officers had seized them based on Cowan's mere presence in the apartment. <u>Cowan</u>, 674 F. 3d at 953. The Eighth Circuit rejected the district court's reasoning, distinguishing <u>Ybarra</u>, which concerned an unwitting patron present while law enforcement search a tavern named in the search warrant, from the circumstances in Cowan's case. <u>Cowan</u>, 674 F.3d at 954. The Eighth Circuit concluded that the pat-down frisk of Cowan was lawful because Cowan's presence at a place of suspected drug trafficking where weapons may have been present entitled the officers to detain Cowan, handcuff him, and pat him down for the purpose of ensuring officer safety.  <u>Id.</u> The Eighth Circuit also noted that, unlike the tavern patron in <u>Ybarra</u>, whose presence at the tavern was unconnected to any illegal activity there, Cowan's presence in the relatively small and enclosed space of the apartment provided the officers with a reasonable basis to believe that Cowan was engaged in a common drug trafficking enterprise with the apartment's other occupants. <u>Cowan</u>, 674 F.3d at 954.

The facts of the present case are highly analogous to those in <u>Cowan</u>. SA Zahn and the officers executing the search warrant for Cabin Five had probable cause to believe that the cabin was associated with drag trafficking and were executing a search for evidence of drug trafficking, including firearms, as set forth in the warrant. Therefore, like the pat-down search in <u>Cowan</u>, the pat-down search of Defendant's person when the officers secured the occupants of the cabin before they executed the search of the premises was justified by concerns for officer safety. In addition, Defendant's presence in the relatively small and enclosed space of the cabin, which is significantly more like the apartment in <u>Cowan</u> than the public tavern in <u>Ybarra</u>, provided the officers with a reasonable basis to believe that Defendant may be part on the common enterprise of possible drug trafficking.

Accordingly, to the extent that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 497], seeks to suppress evidence obtained as a result of the pat-down search of Defendant's person, the Court recommends **DENYING** the motion. [4]

### D.  Search of Defendant's Purse

Defendant next contends that the Court should suppress all evidence gathered as a result of the officers searching her purse during execution of the search warrant for Cabin Five. In her post-hearing memorandum in support of her motion, Defendant appears to assert that the search of her purse occurred as a part of the search of her person. (<u>See</u> Def.'s Memorandum in Support of Motion to Suppress, [Docket No. 952], 9).  The record presently before the Court, however, indicates that the officers searched Defendant's purse after finding it on the table in the kitchen of the cabin after they had already handcuffed Defendant and searched her person.

---

[4] The Court notes, however, there is no indication in the present record, of any evidence that was gathered as a result of the pat-down search of Defendant's person.

It is well established that, when executing a search warrant, officers may lawfully search anywhere on the named premises where the items named in the search warrant may be found. See, e.g., United States v. Ross, 456 U.S. 798, 820 (1982). The items named in the search warrant in the present case included controlled substances, drug paraphernalia, cell phones, records, illegal prescription medication, marijuana, methamphetamine, heroin, monies obtained by drug sales, firearms, ammunition, and other dangerous weapons. As any of those items could be of a size that could be in a purse in Cabin Five, the search of Defendant's purse was therefore lawful.

Based on the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 497], to the extent that Defendant seeks to suppress evidence gathered as a result of the search of her purse.

### IV.   DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, ADMISSIONS, AND ANSWERS, [Docket No. 499]

Defendant next moves the Court to suppress the statements that she made while being interviewed on November 10, 2014. In her post-hearing memorandum, Defendant refers to her challenge to the lawfulness of the interrogation as a violation of her Miranda rights. (See Def.'s Memorandum in Support of Motions, [Docket No. 952], 9). However, the substance of Defendant's argument is that she invoked her Fifth Amendment right to have a counsel present during questioning, but that SA Zahn and the other officer continued to question her. The Government acknowledges that Defendant invoked her right to have an attorney present at the outset of the interview, but it argues that Defendant herself then reinitiated the conversation and expressed a desire to speak with law enforcement. (Govt.'s Memorandum in Opposition to Motions, [Docket No. 1033]).

25

### A.  Standard of Review

"[A] n accused, . . . having expressed [her] desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to [her], <u>unless the accused</u> [herself] <u>initiates further communication</u>, exchanges, or conversations with the police." <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981) (emphasis added).

### B.  Analysis

In the present case, it is undisputed that, after initially being read the <u>Miranda</u> warnings by SA Zahn, Defendant invoked her right to have counsel present. The question remaining for the Court is whether it was the officers or Defendant herself who reinitiated the conversation about the general investigation.

Not all discussion that follows an accused's invocation of the right to counsel will be a reinitiation of interrogation.   In general, questions by the accused or the officer that relate to the "routine incidents of the custodial relationship," will not suffice to initiate further communication for the purposes of the <u>Edwards</u> rule. <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1045 (1983).  Rather, "[i]nitiation by a defendant occurs when the defendant evinces 'a willingness and a desire for a generalized discussion about the investigation.'" <u>Holman v. Kemna</u>, 212 F.3d 413, 417 (8th Cir. 2000) (quoting <u>Bradshaw</u>, 462 U.S. at 1045-46). Ultimately, the Court must examine the <u>totality of the circumstances</u> to determine whether an accused who has previously invoked the right to have counsel present during questioning has subsequently validly—that is knowingly, intelligently, an voluntarily—waived that right. <u>Bradshaw</u>, 462 U.S. at 1045.

Following Defendant's initial invocation of the right to counsel in the present case, Defendant and SA Zahn engaged in a short exchange of questions and answers. In addition to

asking Defendant whether she in fact wanted to have a lawyer present, SA Zahn asked Defendant whether she had a lawyer, how to spell her name, what her address was, and how much money had been taken from her during the execution of the search warrant.  SA Zahn's questions did not seek to open a generalized discussion about the investigation but were merely references to normal incidents of the custodial relationship.  It was Defendant herself who first expressed a change in her desire to have a generalized discussion about the investigation without counsel present.  Accordingly, the Court must determine whether Defendant's waiver of her right to counsel by reinitiating general conversation regarding the investigation was knowing, intelligent, and voluntary.

Typically, a defendant's express statement that she is waiving her right to counsel, after having being informed of that right, is generally considered strong evidence of the validity of the waiver. See, e.g., N. Carolina v. Butler, 441 U.S. 369, 373 (1979). In the present case, Defendant was twice informed of the Miranda rights, once before she initially invoked her right to counsel, and once after she reinitiated conversation about the investigation. Following the second reading, Defendant signed the form indicating that she had agreed to talk to the interviewing officers without having counsel present.  The Court also notes that there is nothing in the record presently before the Court which indicates that the interviewing officers employed any force or other coercive tactics to overcome Defendant's will and obtain her cooperation. Accordingly, the Court concludes that Defendant's waiver of her right to counsel, after she reinitiated the general conversation about the investigation, was knowing, intelligent, and voluntary.

In light of all of the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 499]).

## V.    DEFENDANT'S MOTION TO DISMISS FOR LACK FOR VENUE, [Docket No. 502]

Defendant moves the Court to dismiss the Indictment as to the charges against her for lack of proper venue.

At the motions hearing, counsel for the Government and counsel for the Defendant both represented that it was their position that the issue of venue is intertwined with the elements of the charged offense and, as such, is reserved for the trial court at the close of the evidence. (October 19, 2015, Motions Hearing, Digital Recording 1:36:30 p.m.-1:40:45 p.m.). The determination of whether an act occurred within a district, such that venue in that district was proper, is one for the finder of fact at trial. See, e.g., United States v. Black Cloud, 590 F.2d 270, 272 (8th Cir. 1979).

Accordingly, the Court recommends **DENYING** Defendant's Motion to Dismiss for Lack of Venue, [Docket No. 502], without prejudice.

## VI.    CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED**:

1.   That Defendant's Motion for Severance of Counts and Defendants, [Docket No. 490], be **DENIED without prejudice**, as set forth above;

2.   That Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 497], be **DENIED,** as set forth above;

3.   That Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 499], be **DENIED** as set forth above; and,

4. That Defendant's Motion to Dismiss Indictment for Lack of Venue, [Docket No. 502], be

   **DENIED without prejudice**, as set forth above.


Dated: December 4, 2015.                          s/Leo I. Brisbois
                                                  Leo I. Brisbois
                                                  U.S. MAGISTRATE JUDGE


# N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.