# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 15-165(28) (JRT/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE** |
| YVETTE KOUAYARA, | |
| Defendant. | |

Deidre Y. Aanstad and Melinda A. Williams, Assistant United States Attorneys, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for plaintiff.

Andrew S. Garvis, **KOCH & GARVIS**, Lake Calhoun Professional Building, 3109 Hennepin Avenue South, Minneapolis, MN 55408, for defendant.

Defendant Yvette Kouayara was indicted on one count of conspiracy to distribute certain drugs following her arrest at a cabin near Spirit Lake Casino in North Dakota in November 2014. Kouayara has filed four motions, including two asking the Court to suppress evidence. United States Magistrate Judge Leo I. Brisbois held an evidentiary hearing on the matter and issued a Report and Recommendation ("R&R") recommending that the Court deny the suppression motions as well as the two other motions. Kouayara has now filed objections relating to the suppression motions, and those objections are now pending before the Court. Because the Court finds the search warrant was supported by probable cause and the searches and seizures were reasonable, the Court will overrule

Kouayara's objection to the Magistrate Judge's findings and recommendation on the motion to suppress evidence acquired by search and seizure.  The Court also finds, however, that because law enforcement did not immediately cease interrogation of Kouayara after she validly invoked her right to counsel, the suppression of Kouayara's later statements is warranted.  The Court will therefore sustain Kouayara's objection relating to the motion to suppress statements.  That motion will be granted.

## BACKGROUND

The Magistrate Judge held an evidentiary hearing on Kouayara's motions on October 19, 2015.  At the hearing, the United States offered the testimony of Special Agent Travis Zahn from the North Dakota Bureau of Criminal Investigation.  The following facts are based on Zahn's testimony, as well as uncontested facts described in the R&R.

On November 5, 2014, Zahn received a call from Chief Raymond Cavanaugh of the Spirit Lake Tribal Police Department, informing Zahn that Chief Cavanaugh was looking for a female suspect staying at the Spirit Lake Casino with a group of eight black men.  Chief Cavanaugh said he had received information that the group may have been selling illegal drugs from the casino.

Zahn traveled to the casino to investigate Chief Cavanaugh's tip.  After arriving, Zahn observed four black men walking through the casino and watched casino security video on two different days.  On the second day, Zahn watched a video of a black man later identified as Defendant Calvin Beasley exiting a particular casino cabin, entering the

back seat of a sports-utility vehicle, exchanging money and a small plastic bag with a passenger named William Cavanaugh, and then exiting the vehicle and returning to the cabin. Zahn knew who William Cavanaugh was and knew him to be involved in the drug trade. Based on those facts, Zahn gave an oral probable cause affidavit to a state court judge and received a search warrant to search the cabin. Zahn specifically included in his affidavit a description of the exchange he watched on the security video, and how Beasley had walked into the cabin. The warrant did not name Kouayara or contain facts or a description particular to Kouayara.

Zahn and other law enforcement officers executed the search warrant on November 6, 2014. According to Zahn's testimony at the evidentiary hearing, Zahn and thirteen officers entered the cabin, found five individuals, one of whom would later be identified as Kouayara. The five individuals were handcuffed, searched, and seated, and the officers executed the search warrant. During the search, one officer noticed one of the five individuals, Steve Fagan, staring at a vent in the cabin. The officers looked in the vent and found 460 pills packaged in distribution-like packaging. The officers also found forty to fifty pills in other areas of the cabin. At some point during the search and seizure – Zahn did not specify in his testimony exactly when – officers searched Kouayara's purse. In the purse officers found a false identification document. The officers also asked Kouayara why she was at the cabin, and she replied that she was on vacation. All five individuals were then arrested, read their *Miranda* rights, and transferred to jail.

After four days in custody, on November 10, 2014, Zahn and another officer interviewed Kouayara.  Zahn re-read Kouayara her *Miranda* rights, and within five seconds, the following exchange occurred:

| | |
|---|---|
| Zahn: | Did you want to talk to me about what went on the other night? |
| Kouayara: | Um.  I would like a lawyer to be present. |
| Zahn: | Okay.  Then I'm not going to talk to you about anything that went on the other night or ask you any questions.  Do you have a lawyer right now? |
| Kouayara: | Well . . . you know what . . . Is the . . . I don't know.  I don't know what to do.  Because I need to know where I stand and . . . |
| Zahn: | Okay . . . uh . . . |
| Kouayara: | But I'll talk to you.  I mean I'll tell you . . . |
| Zahn: | Well, if you want a lawyer I'm not going to ask you any questions though.  I can't. |
| Kouayara: | Go ahead and ask me some questions. |
| Zahn: | Well, do you want a lawyer present or not? |

(R&R at 8-9.)  A colloquy followed, with Kouayara repeatedly hedging and questioning with varying degrees of uncertainty whether she should have a lawyer present, and Zahn repeatedly attempting to clarify whether Kouayara wanted a lawyer or not.  (The conversation is reprinted in full in the R&R.  (R&R at 8-10.))  Eventually Kouayara stated "I'll talk to you without my lawyer here," signed a *Miranda* waiver form after being read her rights yet again, and engaged in a fifty-five minute interview.

Kouayara was indicted with one charge of conspiracy to distribute certain illegal drugs on May 20, 2015.  She filed four motions, including two suppression motions:  one asking the Court to suppress evidence seized in the course of the search and seizure, and

another requesting the suppression of Kouayara's statements made in the interview with law enforcement.   The Magistrate Judge held a hearing and issued an R&R on December 4, 2015, recommending that the Court deny all four of Kouayara's motions. On the suppression motions, the Magistrate Judge found the search warrant was supported by probable cause, officers permissibly detained and searched Kouayara while executing the search warrant, the search warrant permitted officers to search Kouayara's purse for drugs, and Kouayara reinitiated conversation after validly invoking her right to counsel.   (R&R at 15-27.)   On December 18, 2015, Kouayara filed objections to the R&R's findings and recommendations on the suppression motions.   (Objs. to the R&R, Dec. 18, 2015, Docket No. 1,118.)

## ANALYSIS

### I.      STANDARD OF REVIEW

When a party objects to a magistrate judge's findings or recommendations on a dispositive matter, "[t]he district judge must consider de novo any objection to the magistrate judge's recommendation.  The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."  Fed. R. Crim. P. 59(b)(1), (3); *see also* 28 U.S.C. § 636(b)(1).

### II.     SUPPRESSION MOTION

Although the Fourth and Fifth Amendments contain no provisions precluding the use of evidence obtained in violation of their commands, the Supreme Court's decisions "establish an exclusionary rule that, when applicable, forbids the use of improperly

obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009).  The proponent of a motion to suppress evidence on the basis of a Fourth Amendment violation "has the burden of establishing that his . . . Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).  But when the proponent seeks to suppress evidence for violation of his or her Fifth Amendment rights to silence and counsel, as recognized by the Supreme Court in *Miranda*, the state bears the burden of showing by a preponderance of the evidence that the defendant waived his or her rights.  *Berguis v. Thompkins*, 560 U.S. 370, 384 (2010); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 269-70 (2011) ("[T]he burden is on the Government to show, as a 'prerequisit[e]' to the statement's admissibility as evidence in the Government's case in chief, that the defendant 'voluntarily, knowingly, and intelligently' waived his [*Miranda*] rights").

## II.    SEARCH AND SEIZURE

Under the Fourth Amendment, made applicable to the States by the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643 (1961), the people are "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, . . . and no Warrants shall issue, but upon probable cause," U.S. Const. amend. IV.  Here, Kouayara argues that the search warrant for the cabin was issued without probable cause, and that officers' searches and seizures of Kouayara were unreasonable.

## A.    SEARCH WARRANT

Kouayara first argues that the search warrant was issued without probable cause, and that all of the evidence associated with the search and Kouayara's detention, arrest, and interview should therefore be suppressed.  "Probable cause to issue a search warrant exists if, in light of the totality of the circumstances, there is 'a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *United States v. Shockley*, 816 F.3d 1058, 1061 (8th Cir. 2016) (quoting *United States v. Donnell*, 726 F.3d 1054, 1056 (8th Cir. 2013)).

Here, the search warrant was undoubtedly supported by probable cause.  In addition to all of the other facts stated in Zahn's affidavit, Zahn noted that he watched Beasley enter a vehicle and give William Cavanaugh, a man whom Zahn knew to be involved in the drug trade, a small bag of the type that in Zahn's experience was used for drugs, and Cavanaugh handed Beasley money in return.  Beasley then exited the vehicle and entered the cabin.  The Court finds that observation alone, as recorded in Zahn's affidavit, was sufficient for a judge to find the presence of probable cause and issue a warrant to search the cabin for drugs and drug-related paraphernalia.  The warrant was therefore valid.  And because the Court finds that the warrant was valid, the Court need not confront Kouayara's argument regarding the Magistrate Judge's alternative finding, that the officers relied on the warrant in good faith.

## B.     ARREST

Kouayara also argues that all evidence stemming from her arrest should be suppressed because the arrest was not supported by probable cause.   The Fourth Amendment protects against "unreasonable . . . seizures."   U.S. Const. amend. IV. "'[T]he general rule [is] that Fourth Amendment seizures are "reasonable" only if based on probable cause' to believe that the individual has committed a crime."   *Bailey v. United States*, 133 S. Ct. 1031, 1037 (2013) (quoting *Dunaway v. New York*, 442 U.S. 200, 213 (1979)).   Thus, in order for a government officer to arrest a person, the officer must generally act with probable cause.   *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). When the Court determines after the fact whether an officer had probable cause to arrest an individual, the Court "examine[s] the events leading up to the arrest, and then decide[s] 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause."   *Id.* at 371 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

Here, the officers had at least three bases for arresting Kouayara:   (1) Kouayara was present in the cabin into which Beasley walked after presumably selling drugs to William Cavanaugh, (2) Kouayara was present in the cabin in which a large number of drugs were found, and (3) officers found a false identification in Kouayara's purse.[1]

---

[1] Zahn's testimony at the hearing before the Magistrate Judge did not make clear whether officers searched Kouayara's purse before or after her arrest.  If the purse was searched after the arrest, the false identification could of course not have served as a basis for probable cause.  But because it is not clear, and also because Kouayara bears the burden in a Fourth Amendment

(Footnote continued on next page.)

Kouayara argues that the first two bases, on their own, are not sufficient to create probable cause because "a person's mere propinquity to others independently suspected of criminal activity does not, **without more**, give rise to probable cause." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (emphasis added) (citing *Sibron v. New York*, 392 U.S. 40, 62-63 (1968)).  But here the officers **did** have more:  Kouayara's false identification would heighten a reasonable officer's attention, and the identification in conjunction with the first two bases together gives rise to probable cause that Kouayara was a participant in a conspiracy involving the distribution of those drugs.[2]

Additionally, although the Court need not reach the issue, the Court notes that Kouayara's mere presence in the cabin where the drugs were found was likely sufficient to create probable cause.  Where officers discover facts giving rise to probable cause that drug dealing is occurring in a small space, and only a small number of people are located in that space, then officers have probable cause to suspect that those individuals are engaged in illegal drug activities because drug dealing is "an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him."  *Pringle*, 540 U.S. at 373.  For example, in *Pringle*, officers found five

_____

(Footnote continued.)

suppression motion, the Court will presume that the false identification could be part of the probable cause basis.

[2] Kouayara also told officers she was visiting Spirit Lake on vacation (in North Dakota, in November), and Zahn suggested that this statement bolstered his probable cause determination.  The Court, however, is not prepared to find this statement a valid basis for probable cause.  Casinos are a destination for many innocent vacationers, even in the winter.

baggies of cocaine in the backseat of a vehicle, wedged in between the raised armrest and the backseat, and then arrested all three individuals in the car, including Pringle, who was sitting in the car's front seat.  *Id.* at 368-69.  The Supreme Court held that "it was reasonable for the officer to infer a common enterprise among the three men" because (1) Pringle and his companions were in a relatively small automobile; (2) car passengers "will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or evidence of their wrongdoing," and (3) drug dealers are unlikely to admit innocent people into their enterprise for fear of furnishing incriminating evidence to someone uninvolved.  *Id.* at 373 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 304-05 (1999)).  Those findings are just as true for five individuals in a small cabin with over 460 pills.  To be sure, Kouayara's presence in the cabin where the drugs were found does not mean she is guilty of a crime, but it does mean that there was probable cause to suspect that she might be guilty of a crime.

Kouayara insists this case is more like *Ybarra v. Illinois* than it is *Pringle*.  In *Ybarra*, officers suspected that a bartender was storing heroin behind the bar at a tavern, so the officers obtained a search warrant to search the tavern and the bartender for heroin and evidence of heroin sales.  444 U.S. at 87-88.  When the officers executed the search warrant, they performed a patdown of the nine to thirteen customers who were in the tavern – but when officers approached Ybarra, who was one of the customers, they went beyond the standard patdown and searched his cigarette pack, locating heroin.  *Id.* at 88-89.  Ybarra was later found guilty of possession after losing a suppression motion.  *Id.* at 89.  On appeal, the Supreme Court reversed on the suppression issue, holding that neither

the warrant nor anything else gave the officers probable cause to suspect Ybarra had committed a crime.  *Id.* at 92-96.  But as the Court noted in *Pringle*, *Ybarra*'s holding depended heavily on (1) the fact that Ybarra was in a place of public accommodation – a tavern – and not a small, private space; (2) Ybarra was present with a greater number of individuals than Pringle; and (3) officers had no reason to suspect that the bartender would admit all of the bar's customers into his suspected drug dealing enterprise. *Ybarra*, 540 U.S. at 372-73.  The opposite is true in this case:  Kouayara was in a small private cabin with only four other people, and officers could assume that the drug dealer or dealers would only permit individuals involved in the enterprise to be present in the cabin.[3]

The Court therefore finds that Kouayara's arrest was supported by probable cause.

## C.    SEARCH OF PURSE PURSUANT TO WARRANT

Kouayara also argues the search warrant did not authorize the officers to search Kouayara's purse.  But the Fourth Amendment authorizes officers, acting pursuant to a valid search warrant, to search the "place to be searched" for the "things to be seized,"

---

[3] The Eighth Circuit also recently rejected an attempt to square a case with *Ybarra*.  In *Bernini v. City of St. Paul*, officers arrested a group of approximately 400 individuals suspected of being part of a large and potentially riotous group protesting the 2008 Republican National Convention.  665 F.3d 997, 1002 (8th Cir. 2012).  Thirty-two of those arrested filed a § 1983 action against the officers, and the Eighth Circuit held that as long as the officers had probable cause to suspect that the "unit" of individuals were participating in an arrestable offense, the Fourth Amendment did not require officers to have particularized suspicion as to each individual. *Id.* at 1003-04.

U.S. Const. amend. IV, including smaller compartments and items within the place to be searched that could reasonably be thought to contain the things to be seized:

> A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. A warrant to open a footlocker to search for marihuana would also authorize the opening of packages found inside. A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search. When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.

*United States v. Ross*, 456 U.S. 798, 800 n.1, 820-21 (1982) (footnotes omitted).

Here, the warrant authorized officers to search the cabin for drugs. Thus, because Kouayara's purse was large enough that it could reasonably be thought to have contained drugs, the warrant authorized officers to search Kouayara's purse. Kouayara again relies on *Ybarra* to argue that the warrant here did not authorize a search of her purse. But *Ybarra* says no such thing. In *Ybarra*, the Supreme Court interpreted the search warrant to authorize a search of the bartender and the premises of a bar – a place of public accommodation – but not to authorize a search of every single patron in the bar. 444 U.S. at 91-92. The warrant here does not pertain to a bar, or any sort of public accommodation. The Court therefore interprets this warrant in line with *Ross* to permit the searching of any item that could reasonably be thought to contain drugs – including Kouayara's purse.

### D.   SEARCH INCIDENT TO SEIZURE

Kouayara also appears to challenge her initial detention during the execution of the search warrant, as well as any searches incident to that detention and incident to her arrest.  First, Kouayara's initial detention was permissible because the seizure of persons present during the execution of a valid search warrant, for the purpose of safety and preventing the destruction of evidence and facilitating the execution of the warrant, is reasonable in the eyes of the Fourth Amendment.  *Bailey v. United States*, 133 S. Ct. 1031, 1037 (2013).  And during that detention, a search of Kouayara's person and items within her reach was permissible for the limited purpose of the safety of officers and those nearby.  *See Los Angeles Cty. v. Rettele*, 550 U.S. 609, 614-15 (2007) ("In executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search").  Kouayara argues that *Ybarra* somehow insulates her from being searched incident to a lawful detention, but *Ybarra* involved different facts.  There, as discussed above, officers escalated their patdown into a full-blown search for drugs, even though they lacked probable cause that Ybarra had drugs on his person.  444 U.S. at 88-89.  Here, nothing suggests the officers did the same.

Any search of Kouayara's person and her belongings incident to her arrest was also valid, because Kouayara's arrest was valid.  *United States v. Robinson*, 414 U.S. 218, 236 (1973).  And to the extent Kouayara challenges the search of her purse, that search was also authorized by the warrant, as discussed above.

## III.    STATEMENTS

Kouayara also requests the suppression of her statements made in her custodial interview after she invoked her right to counsel.   The Fifth Amendment's Self-Incrimination Clause provides, "No person . . . shall be compelled in any criminal case to be a witness against himself."[4]   U.S. Const. amend. V.   In *Miranda v. Arizona*, the Supreme Court famously "concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.'"   *Dickerson*, 530 U.S. at 435 (alteration in original) (quoting *Miranda v. Arizona*, 384 U.S. 436, 439 (1966)).   The Court therefore laid down the now-familiar "concrete constitutional guidelines" necessary to protect "basic" and "precious" constitutional rights, such as the right against self-incrimination: A court may not admit into evidence any statement given during custodial interrogation of a suspect unless law enforcement first provided the suspect with the now well-known *Miranda* warnings.   *Miranda*, 384 U.S. at 442, 479.

After a suspect receives her *Miranda* warning, law enforcement is free to interrogate her.   *Davis v. United States*, 512 U.S. 452, 458 (1994).   But "if the suspect states that [she] wants an attorney, the interrogation must cease."   *Maryland v. Shatzer*, 559 U.S. 98, 104 (2010) (citing *Miranda*, 384 U.S. at 474).   After a suspect invokes her

---

[4]   The Self-Incrimination Clause is incorporated in the Due Process Clause of the Fourteenth Amendment and thus applies to the States.   *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (citing *Malloy v. Hogan*, 378 U.S. 1, 6-11 (1964)).

*Miranda* right to an attorney, "[she] is not subject to further interrogation by the authorities until counsel has been made available to [her], unless the accused [herself] initiates further communication, exchanges, or conversations with the police." *Id.* (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). This secondary *Miranda* rule about post-invocation interrogation – the *Edwards* rule – is a "'rigid' prophylactic," like *Miranda*, and like *Miranda* it is designed to prevent constitutional violation. *Davis*, 512 U.S. at 458 (quoting *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (per curiam)).

"The implicit assumption" behind the *Edwards* rule is that an officer's request for interrogation, if made after a suspect invokes his or her rights, "pose[s] a significantly greater risk of coercion" than the same request if made prior to invocation. *Shatzer*, 559 U.S. at 105. "That increased risk results not only from the police's persistence in trying to get the suspect to talk, but also from the continued pressure that begins when the individual is taken into custody as a suspect and sought to be interrogated – pressure likely 'to increase as custody is prolonged.'" *Id.* (quoting *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990)).

The *Edwards* rule creates costs and benefits, just like the rule in *Miranda*. *Id.* at 106 (quoting *Davis*, 512 U.S. at 458). It has the benefit of "conserv[ing] judicial resources which would otherwise be expended in making difficult determinations of voluntariness." *Id.* (alteration in original) (quoting *Minnick*, 498 U.S. at 151). It also, of course, ensures the suppression of involuntary confessions that would have otherwise been admitted at trial. *Id.* The rule's most notable cost, on the other hand, is the suppression of at least some voluntary confessions. *Id.* at 108. But the Supreme Court

has weighed these costs and benefits, and it has crafted this rule; it is their rule.  *Id.* at 105.

Here, there is no doubt that law enforcement officers warned Kouayara of her *Miranda* rights, and that Kouayara validly invoked her right to counsel mere seconds into the interview by unequivocally stating "I would like a lawyer to be present."   In light of that unequivocal invocation of her right to counsel, the questions for the Court are whether (1) Zahn properly "ceased" the interrogation after Kouayara's invocation, (2) Zahn's post-*Miranda* questions constituted "interrogation" in violation of the *Edwards* rule, and (3) Kouayara reinitiated conversation with Zahn.   For the reasons discussed below, the Court finds that Zahn did not cease interrogation and that Kouayara's post-invocation statements were therefore not the product of her reinitiating contact with Zahn.

## A.   CEASING INTERROGATION

"[I]f [a] suspect states that he wants an attorney, the interrogation **must cease**." *Shatzer*, 559 U.S. at 104 (emphasis added) (citing *Miranda*, 384 U.S. at 74); *see also Davis*, 512 U.S. at 462 ("[I]f the suspect invokes the right to counsel at any time, the police **must immediately cease questioning** him." (emphasis added)).   Neither the Supreme Court nor the Eighth Circuit has explicitly defined what it means for an officer to immediately cease an interrogation, but numerous reported cases show that law enforcement officers can and do literally stop the interview by ending the conversation, turning off recording devices, or directing a suspect to a telephone.  *See, e.g., Oregon v.*

*Bradshaw*, 462 U.S. 1039, 1041-42 (1983) ("Respondent . . . said 'I do want an attorney before it goes very much further.' The officer immediately terminated the conversation." (citation omitted)); *United States v. Michaud*, 268 F.3d 728, 732 (9th Cir. 2001) ("When she indicated she wanted to speak to a lawyer, the interview was terminated"); *United States v. Huerta*, 239 F.3d 865, 873 (7th Cir. 2001) ("[T]he detectives ended the interview once Ms. Huerta indicated that she desired to exercise her right to counsel."); *United States v. Valdez*, 146 F.3d 547, 550 (8th Cir. 1998) ("Valdez requested an attorney. The interview immediately ceased."); *United States v. Duggan*, 936 F.2d 181, 182 (5th Cir. 1991) ("Duggan asked if he could speak to an attorney. Shiver immediately ended the discussion, told Duggan he could call an attorney, pointed to a phone where he could make the call, and began to leave the room.").

In a recent instructive fact pattern, a suspect in custody unequivocally requested an attorney twice, but each time, before law enforcement responded to his request, the suspect continued to speak and ask questions. *Bush v. Warden, S. Ohio Corr. Facility*, 573 F. App'x 503, 504-06 (6th Cir. 2014). Nonetheless, in spite of the statements and questions made by the suspect after invoking his right to counsel, the law enforcement officer did not push forward with interrogation; he instead "attempted to reach over and turn off the tape recorder." *Id.* at 505 n.3. The interview did end up continuing, but only because the suspect interjected, before the officer could turn the recorder off, "Hold on[; l]et me ask you another question, my man," and then conversation continued. *Id.* at 505.

Here, nothing indicates that Zahn sought to "cease" his interview with Kouayara. Zahn did not stand up, walk out, or direct Kouayara to a phone where she could call an

attorney. *See Duggan*, 936 F.2d at 182 (directing suspect to phone). And Zahn did not attempt to turn off the recording device. *See Bush*, 573 F. App'x at 505 n.3. Zahn instead made an additional statement – "Then I'm not going to talk to you about anything that went on the other night or ask you any questions" – and asked an additional question – "Do you have a lawyer right now?" Thus, Zahn did not cease his interview with Kouayara after she invoked her right to counsel, as the Supreme Court's rules in *Miranda* and *Edwards* require for the government to be able to admit into evidence a defendant's post-invocation statements.

### B.   INTERROGATION

It is only a suspect's responses to post-invocation "interrogation" that must be suppressed, and so the Court must determine whether Zahn's words and actions constituted interrogation. In *Rhode Island v. Innis*, the Supreme Court defined "the term 'interrogation' under *Miranda*" to refer "not only" to (1) "express questioning," but also to (2) "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted); *see also Miranda*, 384 U.S. at 444 ("By custodial interrogation, we mean questioning.").

Later, in *Pennsylvania v. Muniz*, 495 U.S. 582 (1990), the Supreme Court further examined the first prong of *Innis* – the question prong – but a majority of justices could not agree on the prong's scope or exceptions. The *Muniz* Court held in an eight-to-one

vote that a suspect's answers to booking questions – questions outside of the context of a custodial interview, attendant to the arrest, that elicit answers about the suspect's name, address, height, weight, eye color, date of birth, and current age – are admissible in court, in spite of *Innis*'s rule that all questions are interrogation. 496 U.S. at 590-92.[5] The Court could not agree, however, as to **why** the answers were admissible. Four justices found that booking questions were interrogation, as defined by *Innis*, but the admission into evidence of a suspect's answers to booking questions does not violate *Miranda* because booking questions are asked "for record-keeping purposes only" and are "reasonably related to the police's administrative concerns" instead of an effort to elicit incriminating statements. *Id.* at 601-02 (op. of Brennan, J.). But only four justices agreed on this formulation of the rule; five members of the Court rejected it. Four other justices, on the other hand, found a suspect's answers to booking questions admissible because booking questions do not put a suspect in the position of having to choose between telling the incriminating truth, lying, or remaining silent and creating an inference of guilt. *Id.* at 607-08 (op. of Rehnquist, C.J.) (stating it is "the truth-falsity-

---

[5] The Court also appeared to agree that not all booking questions are necessarily admissible. "[T]he police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." *Id.* at 602 n.14 (op. of Brennan, J.); *see also id.* at 608 (op. of Rehnquist, C.J.) (permitting booking questions that do not subject the suspect to "the truth-falsity-silence predicament"). The Eighth Circuit has recognized this caveat to the booking exception as well: "Interrogation does not include 'request[s] for routine information necessary for basic identification purposes,'" but "[t]his exception does not apply when 'the government agent should reasonably be aware that the information sought . . . is directly relevant to the substantive offense charged.'" *United States v. Cowan*, 674 F.3d 947, 958 (8th Cir. 2012) (permitting an officer to ask a suspect, pre-*Miranda* warning, how the suspect arrived at an apartment, because the officer "was trying to understand and identify [the suspect's] presence in the apartment").

silence predicament that renders a response testimonial"). That rule statement also failed to garner five votes, however. Finally, Justice Marshall, dissenting on his own, found there should be no booking exception at all, because a broader bright-line rule was best. *Id.* at 609-10 (Marshall, J., dissenting).[6] Thus, because of the Court's fractured decision in *Muniz*, the definition of "interrogation" from *Innis* stands, with a lone exception for booking questions.[7]

Here, Zahn undoubtedly asked a question: "Do you have a lawyer right now?" Thus, under the first prong of the test in *Innis*, because Zahn's question was a question, and because Zahn's question was not a booking question, Zahn engaged in interrogation after Kouayara invoked her right to counsel, in violation of *Miranda* and *Edwards*.

It might be argued that the Court should expand on the Supreme Court's splintered ruling in *Muniz* to hold that Zahn's question was not interrogation. After all, law enforcement officers often ask questions to suspects in custody, even after the suspect invokes his or her right: "Do you need to go to the bathroom?" "Would you like a glass of water?" "How's it going?" But it is less absurd than it might seem that even these benign questions should be covered by *Edwards* and *Miranda* too, because *Edwards* and *Miranda* do not prohibit officers from asking post-invocation questions; **they only**

---

[6] The Eighth Circuit has not explicitly chosen a side in the *Muniz* dispute, but it has cited Justice Brennan's opinion approvingly. *Cowan*, 674 F.3d at 958 (citing *Muniz*, 496 U.S. at 600-01 (op. of Brennan, J.)).

[7] *See Everett v. Sec'y, Fla. Dep't of Corrections*, 779 F.3d 1212, 1242-43 (11th Cir. 2015) (relying on *Innis* for the definition of "interrogation").

**prohibit the admission into court of a suspect's answers to those questions**. *Chavez v. Martinez*, 538 U.S. 760, 772-73 (2003) (holding that an officer does not necessarily violate the Constitution when he fails to follow *Miranda*'s rules).  In this case, Zahn asking Kouayara "Do you have a lawyer right now?" was not itself illegal; the only wrong would be for the Court to allow Kouayara's responses to that question into evidence.

The Court also notes that even if *Innis*'s rigid labeling of all questions outside of booking as interrogation should be toned down, or more exceptions to the rule should be recognized, the last place an exception would be appropriate is for questions asked in the context of the custodial interview.  As the Supreme Court has noted, an officer's request for interrogation after a suspect invokes her right to counsel poses a greater risk of coercion because it signals the officer is persisting in the face of the suspect's assertion of rights, and that "pressure [is] likely 'to increase as custody is prolonged.'"  *Shatzer*, 559 U.S. at 105 (quoting *Minnick*, 498 U.S. at 153).  The Supreme Court has described the "paradigm[atic]" *Edwards* case as

> a case in which the suspect has been arrested for a particular crime and is held in uninterrupted pretrial custody while that crime is being actively investigated.  After the initial interrogation, and up to and including the second one, he remains cut off from his normal life and companions, "thrust into" and isolated in an "unfamiliar," "police-dominated atmosphere," where his captors "appear to control [his] fate."

*Id.* at 106 (alteration in original) (citations omitted) (first quoting *Miranda*, 384 U.S. at 456-57, then quoting *Illinois v. Perkins*, 496 U.S. 292, 297 (1990)).  A few courts have suggested that certain questions asked outside of the custodial interview, and outside of

booking, may be considered non-interrogatory.  *See, e.g.*, *Huerta*, 239 F.3d at 873 (finding that an officer's question, asking that the suspect hand the officers her shoes, which were to be used as evidence, did not amount to interrogation).  But the Court is aware of no cases finding that a question asked during a custodial interview is not interrogation – because the custodial interview is the context where the inherently coercive pressure of custody is at its peak.  Here, Kouayara's case is the paradigmatic case.  While visiting a place far from home, Kouayara was arrested on a Thursday and held in custody over the weekend, until her interview on a Monday.  She never "regained a sense of control or normalcy after [she was] initially taken into custody."  *Id.* at 107. And yet mere seconds into her interview, she unequivocally invoked her right to counsel. Kouayara's case is a textbook *Edwards* case; if further exceptions to *Innis*'s rule are warranted, they are not warranted here.

Finally, even if the Court were to believe that Kouayara's circumstances necessitated another exception to the test in *Innis* – an exemption for questions about whether a suspect has a lawyer, for example – it is not the role of this Court, as a lower court, to craft that exception.  *Miranda* and *Edwards* are the Supreme Court's rules, and the Supreme Court has made clear that it is their obligation, not the obligation of the lower courts, to alter the rules' bright-lines.  *Shatzer*, 559 U.S. at 105 ("Because *Edwards* is 'our rule, not a constitutional command,' 'it is our obligation to justify its expansion.'")

Therefore, Zahn's question of Kouayara after her unequivocal invocation of her right to counsel constituted interrogation.[8]

## C.    REINITIATION

Interrogation must immediately cease once a suspect invokes her right to counsel, but it may begin again if "the accused himself initiates further communication, exchanges, or conversations with the police."   *Shatzer*, 559 U.S. at 104 (quoting *Edwards*, 451 U.S. at 484-85).   "A defendant 'initiates' an interrogation if he or she 'evince[s] a willingness and a desire for a generalized discussion about the investigation.'"   *Owens v. Bowersox*, 290 F.3d 960, 963 (8th Cir. 2002) (quoting *Holman v. Kemna*, 212 F.3d 413, 417 (8th Cir. 2000)).   When a suspect makes a statement in response to a law enforcement officer's words or actions, whether the suspect initiated the conversation hinges on whether the officer's words or actions constituted an interrogation; if the suspect was responding to an officer's interrogation, the suspect is not reinitiating contact.   *See, e.g.*, *Innis*, 446 U.S. at 302-04 (holding that suspect's statements interrupting officers' conversation were admissible because they were not made in response to interrogation); *Huerta*, 239 F.3d at 873 (holding that suspect's

---

[8] The Court also notes that Zahn's statement and question cannot be construed as an effort to have Kouayara clarify an ambiguous statement about her right to silence or counsel. *See Davis*, 512 U.S. at 461 (permitting but not requiring officers to ask clarifying questions when a suspect makes an ambiguous statement that falls short of an unequivocal invocation of a right to counsel). Here, Kouayara's invocation of her right to counsel was unequivocal, and the United States does not dispute that fact.

statements following officer's request for her shoes constituted a reinitiation of conversation and were not made in response to interrogation).

Here, because Zahn's question, "Do you have an attorney right now?" constituted interrogation, as discussed above, Kouayara's statements in response to that question were not an initiation of conversation.

## CONCLUSION

The search warrant was authorized by probable cause because Zahn witnessed what a reasonable officer would understand to be a drug transaction outside of the cabin. The search of Kouayara's purse and person did not violate the Fourth Amendment because the search of the purse was authorized by the search warrant and was permissible incident to Kouayara's seizure, as was the search of her person. And Kouayara's arrest did not violate the Fourth Amendment because officers had probable cause based on her false identification and her presence in a small cabin with a small number of people where officers found an amount of drugs large enough for a reasonable officer to conclude that drug dealing was taking place. Kouayara's motion to suppress evidence as a result of search and seizure is therefore denied.

However, the Court finds that Kouayara's statements in her custodial interview are inadmissible. Kouayara unequivocally invoked her right to counsel seconds into the interview, yet Zahn did not immediately cease the interview, instead asking another question, constituting interrogation. Her later statements therefore cannot be considered

the product of an initiation of conversation on her behalf. Thus, Kouayara's motion to suppress statements made in her custodial interview is granted.

The Court takes care to note that its *Miranda*-related findings today cast little judgment on the officer's conduct. The Court does not find that Zahn's actions violated the Constitution, or that he acted with any sort of ill will – all indications point to the contrary. Instead, the Court's holding today respects only what evidence may be admitted at Kouayara's trial. (The Court also notes that Zahn's interview could still theoretically prove useful to the United States; it would likely not violate *Miranda* for Kouayara's statements to be admitted as evidence in some other individual's trial.)

Had any one of a number of facts about Kouayara's case been different, suppression may have been a more difficult decision. For example, had Zahn first ceased the interrogation after Kouayara's invocation of her right to counsel, and only later asked her if she had an attorney, the Court may have had to test the boundaries of the Supreme Court's definition of "interrogation." Alternatively, had Kouayara called her invocation of her right to counsel into doubt before instead of after Zahn asked if she had an attorney, that too would have been a more difficult case. But on the facts of Kouayara's case as presented, Kouayara's post-invocation statements must be suppressed.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, the Court **OVERRULES in part** and **SUSTAINS in part**, as consistent with the Court's opinion, Kouayara's objections [Docket No. 1118] and **ADOPTS in part** and **DENIES part** the

Report and Recommendation of the Magistrate Judge [Docket No. 1067].  **IT IS HEREBY ORDERED** that:

1.      Kouayara's Motion for Severance of Counts and Defendants [Docket No. 490] is **DENIED**.

2.      Kouayara's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 497] is **DENIED**.

3.      Kouayara's Motion to Suppress Statements, Admissions, and Answers [Docket No. 499] is **GRANTED**.

4.      Kouayara's Motion to Dismiss for Improper Venue [Docket No. 502] is **DENIED**.

DATED:  May 31, 2016                               s/ John R. Tunheim
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                                  United States District Judge